# United States District Court
# District of New Hampshire

# EMERGENCY MOTION

Civil Case Number_____

Kevin Rogers          *(Plaintiff)*
Pro Se
P.O. Box 71
Campton, NH 03223
(603) 728-7199

    vs.

The Honorable Michael H. Garner    *(Defendant)*
In his professional capacity as a
family Court judge, in the 4th Circuit
Court, Family Division
26 Academy St.
Laconia, NH 03246
(855) 212-1234
    vs.
Edythe Murphy            *(Defendant)*
13 Drake Rd.
P.O. Box 234
New Hampton, NH 03256
    *represented by*
Ora Schwartzberg, Esq.
1 Bridge St., Suite 210
Plymouth, NH 03264
(603) 536-2700

[Filing stamp: 2016 NOV 29 P 3:06  U.S. DISTRICT COURT DISTRICT OF NH FILED]

## Motion for Preliminary Injunctive Relief

## Jurisdiction and Venue

Venue is proper, as all actions and parties to this suit have or will occur in the State of New Hampshire.

This Court has jurisdiction under the U.S. Constitution's 14th Amendment, specifically the unequal treatment before the law, clause. Additionally, the judgment the plaintiff seeks relief from, denies the plaintiff his property, without allowing the judgment to be appealed, despite the plaintiff seeking in his motion before the named Court, an injunction, allowing appeal of this decision. The Court, under

Judge Garner, has denied the injunction, so that the plaintiff can appeal this decision and thus is also a procedural due process violation under the 5th and 14th amendments to the Constitution.

The respondent will be irreparably harmed, financially, should the order, for which the plaintiff seeks that this Court enjoin, be allowed to continue, as the issue will be decided by and for, the actions complained of. This will deny the plaintiff the ability to appeal the decision of 4th Circuit Court's decision using the proper appellate procedures, to the New Hampshire Supreme Court.

The plaintiff also believes that he should be afforded the ability to bring this matter before the New Hampshire Supreme Court, which will take approximately 45 days to brief, and be heard, will occur far beyond the time period where the appeal will have any substantive relief, should the order be allowed to proceed. No relief will be available, once this order is carried out, and the harms to the plaintiff's right to appeal the decision, will be irreparable.

Further, this particular order of the Family Court in Laconia, NH represents a takings of the plaintiff's property, in such a way, that he has not had the ability to properly appeal the decision of the trial Court judge. Further the contract, which the plaintiff seeks to enjoin, is likely to be undertaken within days, irreparably harming the plaintiff's rights, as enumerated.

Further, should the plaintiff's appeal to the New Hampshire Supreme Court be unsuccessful, no harms will befall the plaintiff's wife, but that is not the case for the plaintiff.

The respondent will demonstrate this, in his argument section of this complaint.

**Complaint:**

1)      The plaintiff and his ex-wife, Edythe Murphy ("Murphy") have been embroiled in a highly contested Dissolution of Marriage case (450-2015-DM-195), before Judge Michael H. Garner ("Judge Garner").

2)      This divorce case has finalized with the Final Decree of Divorce having issued on 8/4/15.

3)      On 10/1/15, Murphy filed a false and perjurious ex-parte Domestic Violence Petition (450-2015-DV-232) against the plaintiff. This forced the plaintiff to be removed from the marital residence, an apartment located at 13 Drake Rd., New Hampton, NH. The domestic violence petition was subsequently dismissed for the fact that no violence had occurred, and that the plaintiff's wife's answers at hearing were termed "variable" by Judge Garner. Judge Garner allowed the plaintiff's wife to retain exclusive use and control of the marital apartment, granting the plaintiff exclusive use and control of the parties property, a parcel of land in Campton, NH to the plaintiff.

4)      The disabled and terminally ill plaintiff was forced to live in his pick-up truck for the majority of the winter on the parties property while the divorce was pending, upon which there was a home under construction. There had only been a foundation poured and a well dug, at the point the plaintiff was forced to live on the property.

5)      The plaintiff had contracted, and paid the local utility company to install power poles, and to terminate their power installation, at the plaintiff's installed meter socket and temporary electrical service.

6)   On 11/6/15, the plaintiff's ex-wife, sought and received an injunction from the family Court in Laconia, NH, to prevent the plaintiff from installing the power that had been previously paid for, and contracted for.  The Court refused to allow the plaintiff to install the power, despite the plaintiff's claims based on humanitarian reasons, such that he could have had some minimal comforts, and to power his prescribed and medically necessary oxygen equipment, which he had been powering with a portable generator.  The generator was less than reliable, and did present a danger to the plaintiff, in that it did not provide adequate, and reliable power for the plaintiff's medical needs.

7)   The terms of property division had been specified by Judge Garner, on 8/4/16, with the parties required to sell the property.

8)   On 10/24/16, the plaintiff petitioned the Court to terminate the power installation, and to have the utility company return the parties' unused account balance, which totals in the range of some $6,000, returned and that these proceeds be split fairly between the parties.

9)   At hearing on 11/21/16, the matter was heard before Judge Garner, where the plaintiff maintained his position, that the installation of power poles be terminated, and the proceeds be returned to the parties.

10)  At the hearing of 11/21/16, the plaintiff's wife maintained that she wished to now complete the power installation, as she believed that it would increase the sales price of the parties land.  The plaintiff objected, claiming they were naive, to believe that it would increase the value of the parties land, as the installation would destroy the parties picturesque view from the home site.  It should be noted that the listing price had already been set, by the plaintiff's wife, as the Court put her exclusively in charge of listing and selling the parties land.

11)  The plaintiff objected on the basis that the currently planned installation, would detrimentally affect the sales price of the land, given the utility company's improper placement of the upper power pole, right in the middle of the home site's picturesque mountainous view.  Particularly, this power pole and it's transformer blocked the view of an antique covered bridge.  Had the plaintiff installed the power, that he was enjoined from doing on 11/6/15, he would have moved the power pole with the heavy equipment that was on the land at that date.  That heavy equipment has since been removed.

12)  At the hearing of 11/21/16, the plaintiff's wife asserted that she could complete the power installation for the credit balance left on the account.  The plaintiff, being a professionally certified electrical engineer, knows that this was a false statement, made by a naive person, and that in fact, having been the point person, communicating with the utility company, insofar as the specific deficiencies that existed for the power installation, believes that it will cost at least an additional $10,000, owing to the fact that the location of the electrical service is an area where ledge is problematic, and that extensive work would need to be done, beyond a typical installation.

13)  At the hearing of 11/21/16, the plaintiff's wife, under the penalty of perjury, indicated that she could, and would complete the power pole installation for the amount of money left as a credit balance, in the account with the utility company.  The plaintiff only agreed to the plaintiff's wife's claim, that she would complete the installation, for the amount of money in the account, in the advent the Court found against the plaintiff, for his request to terminate the account.

14) The account where the money has been deposited for the power pole installation, is listed, exclusively in the plaintiff's name.

15) The Court, in it's decision, mis-characterized it's decision on the power pole installation, in such a way, as to make it sound that the plaintiff had agreed to the installation to go forward. The plaintiff maintains that this characterization, is false.

16) Further, the Court in it's decision, stripped the plaintiff's concerns about the fact that the power pole installation would in fact, cost additional thousands of dollars, and that the Court's decision appears to have been written in such a way that the plaintiff will be responsible for half of the cost over-runs that will be inevitable. The plaintiff made no such agreement, nor anything approaching the terms the Court listed in it's decision.

17) On 11/28/16, the plaintiff filed a motion for reconsideration of the Court's decision, listing specifically, his objections to the power poles installation, particularly the actual diminishment of the parties real estate value and the fact that the decision ignored the plaintiff's wife's contention that she would be responsible for the cost overruns. and other extraneous matters before the Court that were heard. The plaintiff pointed out his objections, and asked that the Court enjoin the power pole installation from going forward, until as such time as he was able to present a proper appeal to the New Hampshire Supreme Court for this matter.

18) In it's decision on the plaintiff's motion for reconsideration, the Court left open the question about who would be responsible for the inevitable cost over-runs, and implied that they would be equally shared, despite the petitioner having represented, under oath, that they would install the power installation, without there being any cost over-runs. The plaintiff believes the fact that they made this statement, swayed the Court to allow the installation to go forward. Nonetheless, the Court now seems to have revised the history of the proceedings, to the plaintiff's harm, and that further, the Court has revised the terms of the plaintiff's wife's contention that she would complete the installation for the amount of the credit balance in the account.

19) The plaintiff asked that the Court, in his motion for reconsideration, to enjoin the power pole installation to proceed, until such time as he is able to properly appeal the decision to the New Hampshire Supreme Court. An attorney the plaintiff has consulted has indicated that such an appeal, to be filed, and heard, would take a minimum of 45 days, as the requirements of the New Hampshire Supreme Court require written transcripts, and all case file records of the particular motion.

**Argument:**

The plaintiff would first argue that the Court has treated the plaintiff unequally before the law, as he had sought to install the power poles, for humanitarian purposes, in that he needed the power to power his prescribed and medically necessary oxygen equipment, and other medical devices, but was denied, and enjoined by this Court from proceeding with the installation, for no good cause shown by the plaintiff's wife.

The plaintiff would argue, now that the plaintiff's wife has listed the parties real estate for $189,000, prior to the installation of the power poles, that there is and will be no appreciation to the sales price, as contended by the plaintiff's ex wife at hearing on 11/21/16. Rather, the currently planned installation

will destroy at least $10,000 and more likely, far more, in property value if the installation is allowed to proceed.

The plaintiff would further make the claim that the fact that Judge Garner will not enjoin the power installation contract to proceed, without allowing the plaintiff to make a proper appeal before the New Hampshire Supreme Court, denies the plaintiff procedural due process, in the Court's taking of the plaintiff's property. The plaintiff contends that the taking of the funds, in the account for the installation, and the diminishment of the property value, are in fact, the taking of the plaintiff's property without full due process, both substantively and procedurally.

### Relief Sought:

The plaintiff would seek that this Court, under it's jurisdiction over constitutional harms, enjoin the power pole installation from proceeding, and that it issue a temporary injunction, preventing the plaintiff's wife from proceeding with the installation, until such time as a timely appeal has been filed, and adjudicated by the New Hampshire Supreme Court. The plaintiff would seek that this Court inform the defendants, should this Court order a preliminary injunction, of this fact.

The plaintiff would seek that this Court, order this on an emergent basis, as once the power installation is completed, the plaintiff's right to appeal will be denied, and that the harm to the plaintiff's funds in the account and his property value will be irreparably harmed.

Further, if the plaintiff's wife does somehow begin the installation, before this Court may issue an injunction, that the plaintiff be ordered to "undo" any changes made, towards the completion of the installation, at her cost.

Respectfully submitted, and attested to, on 11/29/16,

_____
Kevin Rogers
P.O. Box 71
Campton, NH 03223
(603) 728-7199

I further certify that I have mailed, by U.S. Mail, and by email, a copy of this motion to Ora Schwartzberg, Esq., Counsel for Defendant Murphy on this date:_____

I further certify that I have hand delivered, on this date, a copy of this Motion to the Family Court, in Laconia, NH for Judge Michael H. Garner_____

Table of Contents for Appendices:


Appendix 1 – 3, are the current Court order the respondent seeks to enjoin.
            With Appendix page #1, having the pertinent sentence.

Appendix 4 – 10  The plaintiff's motion for reconsideration for the above mentioned
            order, with pages 4 – 6, listing the specifics of his objections.   The final
            sentence of the highlighted text on page 6, seeks that the Court allow an appeal.
            Prayer A, lists the requests of the Court, insofar as this motion is concerned.
Appendix 11     Handwritten decision, denying the plaintiff's requests, and further imposing new
            terms on the "agreement" which the plaintiff never agree to.   The fact that the
            failed to mention a suspension of the power installation, such that the defendant
            could appeal the decision, indicates the ability of the plaintiff's wife that she can
            proceed, immediately.

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### NH CIRCUIT COURT

Belknap County

4th Circuit – Family Division - Laconia

### In the Matter of Edythe Murphy and Kevin Rogers
### No. 650-2015-DM-195

### Order on Pending Motions

Both parties and Petitioner's counsel conducted a hearing November 21, 2016 on pending Motions. Mr. Rogers withdrew his Motion for Contempt (Index #169) and his Motion for Contempt (#200) and his Motion for Reconsideration of the Court's Order denying ex parte relief on that Motion. The hearing also addressed Ms. Murphy's Motion for Contempt (Index #203) and her Expedited Motion for Contempt (Index #206); Mr. Rogers had filed Objections to each.

The current issues have to do with property in Campton New Hampshire owned by the parties and subject to the Court's Order under the Final Decree of Divorce that the property be prepared for listing, listed, and sold.

As a preliminary matter, the parties agreed that henceforth each party shall send any non-emergency Motions to the other party (or their counsel if they have counsel) via U.S. mail, and that they shall send copies of any emergency Motions via email. The Clerk's office shall no longer be obligated to forward copies of any pleadings to the parties.

The parties also agreed that Ms. Murphy shall have control over the funds being held to complete the installment of electrical service to the Campton property; she shall be entitled to use such funds to complete such service.

Ms. Murphy acknowledged that Mr. Rogers had retrieved and removed the property and equipment from the Campton property; there is no finding of contempt related to removing that property.

Mr. Rogers agreed that he would immediately sign the listing agreement prepared by the realtor; Ms. Murphy will have the realtor overnight it to Mr. Rogers, and he shall sign it and return it to the realtor.

Appendix 1

The most difficult issue for the parties is Ms. Murphy's request that Mr. Rogers be required to deed the Campton property to her so that she can go forward with the sale without worrying whether Mr. Rogers will refuse to sign the deed at the last minute. This is an issue which has arisen at least twice before during this divorce. Mr. Rogers believes that if he were to sign such a deed notwithstanding any other Orders, Ms. Murphy would seek bankruptcy protection and somehow eliminate Mr. Rogers's rights to his share of the equity in the property. He therefore refuses to sign a deed. He testified at this hearing that he is willing to attend the closing and he has no objection to signing a deed contemporaneous with the closing.

Mr. Rogers also reported an intention to hire counsel to assist him or represent him for this stage of the case. On the presumption that he will have an attorney who can retain an executed deed for him and attend the closing on his behalf, the Court orders as follows.

1. Mr. Rogers shall sign the listing immediately and return it to the realtor. The parties shall cooperate with listing, marketing, and sale of the property, as the realtor may recommend.
2. Ms. Murphy shall have exclusive control over the funds held for completion of the electrical service to the Campton property, and shall see to it that those funds are used only for that purpose.
3. If Mr. Rogers hires counsel, he shall see to it that his attorney contacts the attorney or closing agent who is handling the closing on the Campton property, and obtains a draft of the deed for him to review, and, upon agreement as to the form, Mr. Rogers will sign the deed and arrange for his attorney to hold the original in escrow pending closing. Mr. Rogers shall arrange for his attorney, with a power of attorney, to attend the closing on his behalf and deliver the executed deed at the appropriate time.
4. If Mr. Rogers does not hire counsel, the closing agent or buyer's counsel shall send him a draft of the deed they intend for him to sign and the parties shall then agree on a third party, who can be an attorney or other independent person, to retain the executed deed in escrow and attend the closing to deliver the deed at the appropriate time. In such event, Mr. Rogers shall be entitled to attend the closing and shall cooperate to sign any documents reasonably necessary to complete the closing. The parties shall find a way to waive or honor the provisions of the current Civil Stalking Orders to enable the closing to go forward without a violation of that Order.

*Appendix 2* [handwritten]

5. The parties shall have authority, by agreement, to modify the terms of this Order should something arise during the closing or preparation for the closing which makes any term of this Order impractical or unwieldy.

6. Ms. Murphy reported an intent to seek a further award of attorney's fees; her right to do so is preserved, but subject to her filing a written Motion, as is Mr. Rogers's right to object.

7. Mr. Rogers reported an intention to seek further relief as to the impact of the Court's Order on retirement accounts pursuant to ERISA. The Court does not forecast what the ruling might be on such a request, or even whether such a request can be made at this time, but Mr. Rogers was advised that such a request would have to be via written Motion. Each party's rights are reserved.

**So Ordered:**

_11/24/16_
**Date**

_[signature]_
**Michael H. Garner, Circuit Court Judge**

Appendix 3

# State of New Hampshire
### 4th Circuit Court, Family Division, Laconia, NH
*In the Matter of Edythe Murphy and Kevin Rogers*
### 650-2015-DM-195

### Ex-Parte Motion for Reconsideration of Order on Pending Motions

I, Kevin Rogers, attest to the following facts, and seek that this Court reconsider particulars of the order which this Court issued on 11/21/16.   The exigency, and need for this Court to review this reconsideration is that should the petitioner move forward with this order, the respondent will be harmed, financially, in an irreparable way, and that his rights of appeal will be nullified by the actions as having been completed.

The respondent seeks reconsideration of three points of this decision and that failure of this Court to address these points, significantly abrogates the respondent's constitutional rights under both the New Hampshire and U.S. Constitutions.

### Point One:

The respondent believes the Court has mis-apprehended the "agreement" on the part of the respondent in this Court's decision.   Particularly, as the respondent did not willingly agree to the power installation contract proceeding as listed in this Court's decision, but rather, the respondent had sought specific terms should the Court find in favor of the petitioner and against the respondent, which it has.   The respondent believes that this is far from the "agreement" that the Court has apparently decided exists between the parties and that the Court left out the specific terms of this "agreement" the Court, unilaterally, decided the respondent agreed to.

The respondent believes that the plans for the current power installation will diminish the parties' property value by at least $10,000, and likely, more than that.   The reason for this diminishment of property value is that the plans for the power installation currently envision a power pole, transformer, and a guy wire being placed, right in the picturesque view of the home site., and that any potential buyer would find the installation objectionable, as did the petitioner and the respondent.   The linemen who installed the pole, were actually laughing at the ridiculous installation, and it's effect on the property's view.   The respondent discussed specific solutions to the planned installation, which would have minimized the impact of the power installation, none of which were cheap, however, they were labor intensive, which would have minimized the costs and visual impact of the poor placement of the power pole.   At the time of the power pole installation, even the petitioner objected to it's placement.

Further, the respondent believes that the current installation, as planned, will be unsafe.   The respondent is an ABET certified, professional electrical engineer, (PE) and is a qualified to make the determination that the current installation, as planned, will be unsafe.   The technical reasons will be listed in the listing of cost over-runs at the end of this section.   The respondent's professional opinion is that the current power installation, aside from being detrimental aesthetically, will be unsafe, unless far more money is spent on the installation.   It will take upwards of an additional $10,000, to make the installation safe, with no cost recovery, in property value appreciation, for such an installation

The Court made no mention, in this Court's decision that the petitioner would bear all costs for this power installation.   The respondent believes that the petitioner and her attorney are not qualified to know they will be able to complete the installation, for the amount of the credit balance left in the account, and the respondent believes that this Court's decision does not, in any way, list the fact that they have made the statement that they will complete the power installation for the amount left.   The

*Appendix 4*

respondent makes the claim that in order for the power installation to go forward, that there will need to be significant additional work, which the petitioner nor her attorney could be aware of, given their relative naivete of the installation conditions, specifically, and their general knowledge of the specifics of the power installation.   These costs include:

1)  Additional tree clearing will need to be performed, such that a 24 foot, minimum, clear path from the road, to the final power pole, is cleared.   The respondent estimates the cost for this work at $1,000.
2) Road reparations, such that NHEC can get their truck onto the property to complete the work, and was a deficient condition found by the NHEC representative upon his pre-installation inspection. The respondent believes that the road repairs will cost in the neighborhood of $1,000 - $2,000, beyond what has been paid to NHEC.
3) The buried conduit, running from the power pole, to the meter socket, cannot be located 3 feet below grade, due to ledge conditions which exist on site.   The 35 – 45 foot run of conduit will need to be encased in 12" of concrete, in all directions.   This means that 4 cubic feet of concrete will need to be poured for each lineal foot of conduit.   This was a specific requirement of the NHEC representative who made an inspection visit and was listed as a deficiency.   This will cost an additional $1,000 - $2,000, beyond what has been paid to NHEC.
4) As there is only 2 feet of soil, due to ledge, in the location where the meter socket is located, the two ground rods that need to be driven into the earth for a code compliant grounding system, to a 10 foot depth, is impossible.   Drilling the rods into the ledge, is not proper in that a poor earth to ground connection will be made.   As such, an engineered grounding system is required.   A grounding system will need to be designed, and installed per a professional engineer's direction.   This will then need to be tested to determine that a proper earth ground has been attained, prior to NHEC's continuation of the power installation.   The cost for this is not easily calculated, in that there will need to be the proper amount of grounding installed, until such time as a proper ground is attained.   Generally speaking, trenches will need to be dug, and ground rods should be CAD welded together, in a variety of configurations.   These trenches are then "salted" such that the soil becomes conductive enough, and that there is enough conductive soil in contact with these rods, to make the proper ground.   Generally speaking, a "star" configuration is typically used in these situations, however, given the proximity of the driveway, and the extensive ledge that is on site, it will be impractical to install such a system.   The respondent knows, and believes, that the cost to attain proper ground will not be inexpensive, but would have been, when the respondent had heavy equipment located on site, and could have used his engineering knowledge to design and test such a grounding system.   The respondent believes that with the engineering and installation, the costs for this system will easily reach $2,000 and probably more than that.  Had the petitioner not enjoined the respondent from completing the power installation, the costs would have been less than 200 dollars.
5) The wiring that has been buried on site, from the meter pedestal to the home site has deteriorated to the extent that the wiring is now unsafe, and will need to be replaced to make the installation safe. This will easily cost $2,000 as the cost of the wire exceeds $1,000 and the 200 feet of conduit will need to be dug up, and replaced.
6) An electrician will need to be contracted, who will actually install the grounding, wiring, and meter socket, to the extent that his fees will easily reach $1,000.
7) Optionally, but perhaps most importantly, as the guy wire's location will seriously degrade the property's value, a block of concrete, of approximately 3 – 4 yards, should have been poured downslope of the pole, and instead of guy wires, steel "L" beams would have been anchored into this concrete block, to act in place of the guy wire, and would have been invisible to the power pole installation.   When the respondent had heavy equipment on property, he would have moved the pole, away from the view, and installed this type of supplemental "guy" support, to have minimized the aesthetic aspects of the power pole installation, such that his costs would have been simply for the

Appendix 5

concrete and steel, and would have cost less than 800 dollars, exclusive of labor, which the respondent would have provided.

The respondent maintains that the naivete of the petitioner in claiming she can proceed with the installation without there being cost overruns is false. In actuality, the respondent, being fully familiar with the costs, and specifics of the site location, maintains that, minimally, cost over-runs of $8,000, can be expected, and likely more. These cost over-rus are beyond what has already been paid to the power utility company (NHEC), and are the homeowner's responsibility.

Finally, the respondent believes that the fact that the Court now will allow the power installation to go forward, based on the petitioner's request, is as good as an example of undue influence upon the Court as the respondent could provide for the following reason:

The respondent was enjoined by this Court from completing the power installation on 11/6/15, based on the petitioner's request. This injunction was put in place despite the fact that the respondent needed the power to be installed for his medical equipment, and to have even the slightest comforts as he lived in his truck upon the land throughout the best part of last winter. The barbarity of this injunction, speaks for itself. Now, upon the petitioner's request, and against the wishes of the respondent, the Court will now allow the power installation to go forward. The respondent believes this best exemplifies the unfair, barbaric, and unequal treatment he has received from this Court throughout this DM, and claims unequal treautment under law.

The respondent knows that to properly complete the power installation, that there will be significant costs, approaching, and perhaps exceeding $10,000 beyond which the power company has already been paid, and that the respondent indicated this at hearing. Further, the respondent presumes, despite the petitioner claiming that they will complete the installation, with the money left in the account, is a claim made, without the research necessary to know the costs. The respondent believes that they will not complete much of the power installation, beyond that which is already paid for. The respondent fully expects that the petitioner will come back to this Court, seeking to be compensated for these costs, despite their having said they can complete the power installation for the amount of money left on the account. The respondent fully believes that this Court will accede to their wishes, for additional funds, based on past decisions of this Court, and the respondent objects, accordingly.

The respondent objects to this Court's decision, as written, and the respondent would seek to have the power installation suspended, until such time as the respondent can appeal the decision of this Court related to the power installation.

### Point Two:

The Court went into great detail, insofar as the closing and deed transfer of the property, which is fine, but the Court has completely ignored the respondent's request that the proceeds of the sale, **NOT** be held in the petitioner's attorney's non-interest bearing trust account. The respondent has shown this Court more than good cause, as to why the petitioner and more specifically, her attorney are not trustworthy to hold these funds. The respondent will recount the reasons, for why this is so, for the Court's reconsideration. The respondent specifically objects to this Court allowing the petitioner's attorney to retain the proceeds of the sale of the property.

First, it is without doubt, according to a bankruptcy attorney the respondent has consulted for this particular matter, that if the petitioner's attorney holds these funds in her account, the petitioner could submit her promissory notes to this "trust", and that the petitioner's attorney could then pay these promissory notes to the petitioner, under the veil that these are true debts encumbering the property. Or, the petitioner could simply file bankruptcy after the sale of the property, listing her false promissory notes as creditors, and inflated attorney's bills as creditors. The petitioner has granted the petitioner's

Appendix 6

attorney a security interest in the parties' property, which the respondent would note was a hypothecation of the parties' property, while the divorce had already commenced, and can and should be contemptible.  The respondent has shown the Court evidence that the petitioner did hypothecate the parties' retirement accounts, though the Court did not make mention of this in it's final decree of divorce, nor in the Court's reconsideration of the divorce decree.   This was done in direct contravention of the standing orders of this Court on hypothecation of the parties' assets, yet this Court couldn't even make mention of this, in it's decisions, at any point.   It was also a direct violation of this Court's specific temporary orders issued on 11/16/15.

The respondent believes that the Court has mis-apprehended, or ignored, the risk to the respondent's share of the marital estate that will exist if this Court allows the attorney for Ms. Murphy to retain the proceeds of the sale of the property in her attorney's non-interest bearing account.   The respondent specifically requested this, in his objections to the petitioner's request for an expedited hearing on the contempt motion, and the respondent then again, requested this orally at this hearing.   **The Court has ignored the respondent's request, and the respondent wishes the Court leave the orders in place, for the deed transfers and sale of the property, with the proceeds of the sale to be held by a neutral third party, other than the petitioner's attorney.**

   That this attorney has suborned perjury will soon be adjudicated by other courts and disciplinary committees, but was demonstrated to this Court by the petitioner in his motion for contempt that was to be heard by this Court on 11/21/16.  The documentary evidence, as shown to this Court, does in fact meet the standard of "beyond a reasonable doubt" based on other authorities' opinions.  The petitioner did in fact withdraw this motion for contempt, as the petitioner's have engaged in a clear, and convincing pattern of witness tampering and intimidation, for which this Court has abrogated it's duty to protect the respondent from.   Nary a word from this Court, on the reasons for the petitioner's withdrawal of his contempt motions, the respondent believes, further indicates the petitioner's undue influence upon this Court.  The respondent will re-litigate these matters before other, impartial tribunals.   Nonetheless, the respondent has shown good cause for this Court to deny the proceeds from the sale of the parties' real estate be retained by this attorney, for the crimes as alleged in the respondent's motion for contempt which was withdrawn.  The documentary evidence presented, the respondent believes, was damning, and the facts are simple, and documented:

   I) On 11/4/15, this attorney presented an all cash offer of $40,000 to the respondent.   The respondent and other authorities believe the timing of this offer, given the petitioner did deposit $50,000 into her bank account two days later, is indicative of the fact that this attorney did know the petitioner had 50k in her bank account on, or about 11/6/15.  This $50,000 was not listed on the petitioner's financial affidavit, dated 11/16/15, an affidavit which was prepared and notarized by the petitioner's attorney on 11/13/15.

   II) Further, after the respondent rejected the petitioner's offer on 11/9/16, this attorney threatened the respondent that if he did not accept their offer of $40k, that the cash offer would no longer be available and the $40,000 would be spent on litigating the case.

   III) The petitioner did file a financial affidavit with this Court on 11/16/15, dated 11/13/15, and this financial affidavit was prepared and notarized by the attorney in question.   This financial affidavit listed the petitioner's bank account balances as blank, or, indicative of having nothing in the bank

Appendix 7

IV) The fact that this attorney engaged in these negotiations, and threats, are clearly indicative of her knowledge of the petitioner's financial situation, and that this attorney having prepared, and notarized, and submitted this affidavit represent clear evidence of perjury by the petitioner and subornation of perjury by the petitioner's attorney.   The emails representing the cash offers, and the threats made by the attorney are parts of the email submissions by this attorney and the bank statements showing the 50k in the petitioner's bank accounts are clear proof that a false financial affidavit was prepared, notarized, and sworn to by the petitioner and her attorney to extent that it has exceeded the probable cause standard, necessary for criminal prosecutions.

V) Further, the promissory notes, which were dated on 10/27/15, and 11/7/15, which are in clear conflict of the financial affidavit prepared, notarized, and filed by the petitioner and her attorney, are clear evidence of forgery, given the attorney submitted them as evidence at final hearing, and had prior knowledge they were false, when the attorney submitted them.

VI)  These promissory notes, and bank balances in the financial affidavit submitted on 11/13/15, were in conflict with the petitioner's bank records.

VIII)  Additionally, the two $5,000 dollar promissory notes submitted by the petitioner, and her attorney are nowhere supported in the petitioner's bank records, of which the respondent submitted attested copies of the entirety of her bank statements, obtained directly under subpoena.

IX) The relative proximity of the dates of these promissory notes, dated on 10/27/15, and 11/7/15, with the falsely filed financial affidavit of 11/13/15, clearly negate any "oversight" objections of defenses of the attorney and the petitioner.

X) In fact, these promissory notes, and other debts that were "inflated" by the petitioner and her attorney were indicative of a pattern of inflating her debts, so as to have the Court believe the petitioner had assumed debts, which in fact, she had not.  This was done to deny the respondent the ability to have all of the material facts, in regards to the petitioner's financial "health", or lack thereof, before the trial court, when an alimony determination was made by this Court. The respondent would note that this "trick" in divorce proceedings is as old as perhaps divorce itself, however, the respondent believes that the overt, and willingness to engage in criminality should have been dealt with, accordingly, by this Court, and was not.

XI) On 11/6/15, 11/13/15, and 11/24/15, the petitioner's attorney did take three checks, for $5,000 each, on the listed dates, clearly indicative of the fact that the petitioner's attorney knew, full well that the petitioner's financial affidavit was false and penurious.  A false and penurious. financial affidavit which this attorney did notarize and fraudulently submit to this Court.

XII)   The respondent believes, and there is a clear body of case law, that the Court upon which the fraud, as described, has been committed, has a clear conflict of interest in adjudicating such a fraud committed upon it, given the fact that the Court that was defrauded, should be considered a party to the litigation, and as such, does not represent an impartial Court, for such contempt to be heard.

**XIII)  The Court should also note the fact that the petitioner, while claiming exigency exists for the need to sell the property, and the fact that the petitioner and her attorney asserted at final hearing the property's fair market value was $155,000, have chosen to list**

Appendix 8

**the property at $189,900, clearly indicative of fraud, and false statements having been made to this Court to subvert justice.   This is not just inconsistency, but material misrepresentation to this Court.**

XIII) Further, even though the respondent has withdrawn his contempt motion, the respondent believes that his withdrawal of this motion for contempt, the respondent believes, **does not relieve this Court from it's duty to report this information, as it's duty under the judicial code of conduct, to the appropriate authorities, including, but not limited t**o: the attorney disciplinary committee and the administrative branch of government.  The evidence presented, the respondent believes, is clear and convincing.   The respondent believes that the respondent's withdrawal of his motion for contempt, relieves the Court of it's responsibility from taking disciplinary action against this attorney, as substantial evidence of this attorney's misconduct and criminality have come into the possession of this Court.   Evidence which is clear and convincing, and the Court, the respondent believes, has a judicial duty, under the judicial code of conduct, to take action against this attorney.   The case is clear, convincing, and damning, and the Court should act accordingly.

**Point Three:**
   The respondent does not intend to hire counsel, but rather consult an attorney any deed transfers.   This Court has indicated that the parties may make agreements and negotiate certain aspects of the sale of the property for expediency's sake, writing in it's decision:

*"5.  The parties shall have authority, by agreement, to modify the terms of this Order should something arise during the closing or preparation for the closing which makes any term of this Order impractical or unwieldy."*

The Court has left the respondent without the ability to communicate, in any way with the petitioner or her attorney, and this Court's indication that the parties can come to outside agreements ignores the inability of the respondent to communicate, in any way, with the petitioner on any matters.   The respondent believes that the petitioner will attempt to "dictate" any changes they seek, and then complain to the Court when the respondent does not comply, seeking contempt charges, and the respondent seeks that item #5 be stricken from this Court's order, as it is a "contempt trap" for the respondent.   The respondent does not seek a "carve out" to communicate with the petitioner's attorney, based on their past willingness to make false statements to authorities and their having committed the crime of false imprisonment against the respondent for his communications.   The respondent believes that any changes to the terms of the sale, be brought before the Court, as is his right.

**Point Four:**

In closing, the respondent would make one point of order, for the Court's edification: namely, that this Court upheld in it's stalking petition found against the respondent, a finding that the respondent had violated the statute of harassment on the grounds of 644:4 -1(f).  The respondent had pointed out, in his motion for reconsideration, that the statute under which this Court made it's finding, was found unconstitutional in 2005.   The Court in it's reconsideration decision indicated that the state legislature had not repealed this statute, as the Court believed that the legislature wished to allow stalking petitions to be found on this particular statute.   **The respondent would point out, to the Court, that the statute was in fact, repealed,** before the Court made this finding, and is a plain error of law.   As this Court, effectively denied me the opportunity to make a timely appeal to the NH Supreme Court, by

*Appendix 9*

denying the respondent access to the marital case files, the respondent is in the process of having this adjudicated in the federal court.

**Prayers:**

A.   That the power installation contract be canceled.   In the advent that this Court allow the power installation to proceed, that the terms of the respondent's agreement, be in writing, that any and all costs and liabilities, be borne solely by the petitioner, as was the respondent's position at hearing, and for which the Court stripped these particular stipulations of the respondent.   Further, the respondent would seek that this Court enjoin the petitioner from proceeding on this power installation, until as such time as the respondent has appealed this decision, and the appeal has been decided.

B.   That this Court order the proceeds from the sale of the property, be retained by anyone other than the petitioner or her attorney, for good cause shown in point #2.   The respondent believes that should the Court proceed with the terms of the sale for the property, with the petitioner's attorney being able to retain the proceeds from the sale, represents unequal treatment under the law and unduly places the respondent's share of the marital estate in undue jeopardy.

C.   That this Court take disciplinary action against this attorney, based on the evidence as shown to this Court, as is this Court's duty under the judicial code of conduct.   The facts are clear, and incontrovertible.   The attorney can have her hearing before the attorney disciplinary committee, if the Court is concerned about due process.

D.   The respondent is unaware of how he can come to agreement to suspend, or waive the protective order, in place, that will allow him to attend the closing, given he is unable to communicate with the petitioner's attorney, nor the petitioner.   The respondent believes that this Court should fashion the waiver, which will enable the respondent to attend the closing.

E.   The respondent would seek that this Court strike it's clause related to the parties being able to modify the Court's orders, based on the reasons listed in point #3.   This particular clause in this Court's decision represents a "contempt trap" for the respondent, and is unworkable, given the respondent's complete inability to communicate with the petitioner or her attorney.   The respondent does not seek a "carve out" exception to this Court's current orders, for communications related to the closing.   The respondent believes that his being entitled to attend the closing, is not proper protection from the petitioner and her attorney from filing false protective order violations, and that the Court should provide the respondent with specific orders, stating the date, time and place, where the respondent is to appear.   The petitioners can file a motion with the Court, when these facts are known, seeking such an order, exempting the respondent from the protective order, should it still remain in force.

Submitted on 11/28/16,

_____
                        Kevin Rogers


I further certify and attest that I have emailed a copy of this motion to the opposing counsel on the date submitted to this Court:_____

*Appendix 10*

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
http://www.courts.state.nh.us

| | |
|---|---|
| Court Name: | 4th Circuit-Family Division-Laconia |
| Case Name: | In the Matter of Edythe Murphy and Kevin Rogers |
| Case Number: | 650-2015-DM-00195 |

## ORDER ON *EX PARTE* (EMERGENCY) MOTION

A motion for *ex parte* or emergency orders has been submitted. The Court has reviewed the motion.

☒ 1. **The Court issues the following orders**, which will remain in effect until further hearing:

☐ A. The ☐ Petitioner ☐ Respondent **(check one)** shall have temporary sole decision-making and residential responsibility for the minor child(ren).

☐ B. The ☐ Petitioner ☐ Respondent **(check one)** shall have temporary sole residential responsibility for the minor child(ren).

☐ C. The ☐ Petitioner ☐ Respondent **(check one)** shall not interfere in any way with the personal liberty or property of the other nor the household property used in the care of the minor child(ren), nor do any act to interfere with the other parent's decision-making and residential responsibilities for the minor child(ren).

☐ D. The ☐ Petitioner ☐ Respondent **(check one)** is awarded temporary exclusive use of the parties' residence at _____ (residence address) and household furniture and furnishings therein.

☐ E. The ☐ Petitioner ☐ Respondent **(check one)** shall not enter the residence or property of the other.

☐ F. Each party is restrained and enjoined from transferring, encumbering, hypothecating, concealing or otherwise disposing of any property except in the ordinary course of business or for the necessities of life.

☒ G. Other: 1. The question of payment for the electric access is reserved until there are no funds left in the account. 2. The escrowed funds from the sale shall be held by a neutral third party. The parties may communicate by letter or email through Petitioner's counsel only about the listing and sale. 4. Denied. The order speaks for itself.

☐ 2. **No *ex parte* or emergency orders are issued** - no showing of imminent danger of irreparable harm.
  ☐ The case shall be scheduled for a prompt hearing with Petitioner and Respondent present.
  ☐ The case shall be scheduled in the ordinary course.

☐ 3. **Request for ex parte orders is denied.** No hearing is required.

A hearing on the *ex parte* motion, and any orders issued, is scheduled for: _____ (date of hearing) at _____ (time of hearing)

**So Ordered:**
November 28, 2016
Date

_[signature]_
Signature of Judge

Michael H. Garner
Printed Name of Judge

*Appendix 11*